AETNA EXPLOSIVES CO. v UNITED STATES (No. 1974).[1]

1. STATUTORY CONSTRUCTION.

　　A thing may be within the letter of a statute and yet not within the statute because not within its spirit nor within the intention of its makers.

2. STATUTORY CONSTRUCTION.—DOUBT FAVORS IMPORTER.

　　When there is doubt as to the construction of a provision of law levying duty upon imported merchandise, it is the duty of the court to resolve that doubt in favor of the importer.

3. CONSTRUCTION, PARAGRAPH 5, TARIFF ACT OF 1913.—"CHEMICAL * * * MIXTURES."

　　The provision of paragraph 5, tariff act of 1913, for "chemical * * * mixtures" imports mixtures susceptible of commercial use as they exist, or at least such as are purposely started on their way toward adaptation to such use.

---

[1] T. D. 38238 (38 Treas. Dec., —).

4. ACIDS, NITRIC AND SULPHURIC, MIXED.

Nitric acid was imported in tank cars with a sufficient addition of sulphuric acid to prevent it from corroding the tanks, in accordance with the regulations of the Interstate Commerce Commission. It was shown that it was commercially impracticable at that time to ship nitric acid in any other way; that the mixture had no commercial use; that no commercial advantage was gained by the importation of either acid in this manner; that there was no chemical union of the two acids: and that, before being used 1 y the importer in manufacturing explosives, it was necessary to add more sulphuric acid. This is not a "chemical * * * mixture" within the meaning of that term in paragraph 5. tariff act of 1913. What was imported was nitric acid. admissible free of duty under paragraph 387, tariff act of 1913. The sulphuric acid (also admissi' le free of duty under paragraph 387) should be treated as a part of the packing of the goods for shipment.

United States Court of Customs Appeals, December 30, 1919.

APPEAL from Board of United States General Appraisers, G. A. 8235 (T. D. 37927).

[Reversed.]

*Pratt. Koehler & Boyle* (*Addison S. Pratt* and *George Roberts* of counsel) for appellant.
*Bert Hanson.* Assistant Attorney General (*Charles D. Lawrence.* special attorney, of counsel). for the United States.

[Oral argument Oct. 16, 1919, by Mr. Pratt and Mr. Lawrence].

Before MONTGOMERY, SMITH, BARBER. DE VRIES. and MARTIN. Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:
The merchandise, the duty upon which is the subject-matter of this case, was assessed for duty at 15 per cent ad valorem under paragraph 5 of the tariff act of 1913 as a chemical mixture. It was claimed by the importer to be free of duty under paragraph 387 as nitric acid or as nitric acid and sulphuric acid. This claim of the importer was overruled by the decision of the board, General Appraiser Brown dissenting. The case is brought here for review in the regular way.

The facts relating to the importation may be stated as follows: The importer maintained a plant at Emporium, Pa., for the manufacture of high explosives. For use in this business, nitric acid in very considerable quantities was a prime necessity. This nitric acid was imported from its plant at Drummondville, Canada. For the purpose of protecting the iron tank cars in which the necessities of their business required them to import this nitric acid, it was necessary to add about 20 per cent of sulphuric acid. The regulations of the Interstate Commerce Commission in force at the time required that this addition to the nitric acid should be made before shipment in tank cars would be permitted. The record in the case shows that only enough sulphuric acid was added to comply with this regulation, and the question involved in this case is whether within the fair import or the intendment of paragraph 5 of the tariff act of 1913, this importation, consisting of nitric acid thus diluted or mixed with the sulphuric acid, is a chemical mixture.

This provision reads:

Alkalies, alkaloids, and all chemical and medicinal compounds, preparations, mixtures and salts, and combinations thereof not specifically provided for in this section, fifteen per centum ad valorem.

Without setting forth the regulations of the Interstate Commerce Commission at length, it will suffice to say that under the regulations nitric acid of any specific gravity may be shipped in glass bottles with ground glass stoppers of a capacity not exceeding 7 pounds of acid; that nitric acid of a specific gravity less than 1.43 may be shipped in glass carboys well cushioned by material that will not be ignited by the acid; that when the specific gravity is between 1.43 and 1.49, the acid may be shipped either in glass carboys well cushioned by incombustible packing material, provided that they are packed in tight cylindrical iron cases covering the bottom and sides and fitting tightly in outside wooden boxes, or in the aforesaid glass bottles with ground glass stoppers well cushioned by material that will not be ignited and packed in strong wooden boxes, barrels, or kegs; and that when the specific gravity of the nitric acid exceeds 1.49, it can be shipped only in the aforesaid glass bottles, each bottle packed separately in a tightly closed metal container and well cushioned by material that will not be ignited by the acid.

Nitric acid mixed with sulphuric acid may be shipped in iron drums, or in tank cars, or in glass carboys packed as is required when nitric acid of a specific gravity between 1.43 and 1.49 is shipped, i. e., well cushioned by incombustible packing material in a tight cylindrical iron case covering the bottom and sides and fitting tightly in an outside wooden box.

The nitric acid manufactured by the importer at its plant in Canada, the subject of the protests here involved, was the strongest made, viz, 89.55 per cent. Its specific gravity was 1.4904, apparently falling just outside the limitation for shipment without the admixture of sulphuric acid in any other than the small glass bottles.

Mr. Wollenberg, the importer's general manager, testified that he had tried to obtain enough carboys, but that he had found it impossible to obtain them.

Prior to the opening of the European war in 1914, about 75 per cent of all the nitric acid that was shipped in the United States was shipped in tank cars mixed with sulphuric acid; the balance was shipped in glass carboys as straight nitric acid without the admixture of any sulphuric acid. There was never any noticeable movement of high strength, i. e., 90 per cent nitric acid in glass carboys, practically all such shipments in glass carboys being shipments of commercial, i. e., 67 per cent nitric acid, without the admixture of any sulphuric acid.

The shipments in tank cars consisted of nitrating acids and fortifying acids. Nitrating acids contain from 60 per cent to 75 per cent

of sulphuric acid, fortifying acids from 47 per cent to 50 per cent of sulphuric. The former are used directly in the manufacture of nitroglycerine, or nitrocellulose or other nitro explosives, the latter in bringing up to a greater strength spent acids, i. e., mixtures of nitric acid, sulphuric acid, and water in which the nitric acid has been decreased by use and the water increased to such an extent that they can no longer be used. No other mixtures of other percentages of nitric acid and sulphuric acid were shipped in tank cars prior to the war, and no mixtures containing less than 45 per cent of sulphuric acid.

The European war caused an enormous expansion in the explosive industry in this country and a tremendous increase in the output of both nitric and sulphuric acids. This necessitated the transportation of nitric acid in large quantities, with the result that inquiries were made of the Bureau of Explosives as to the least amount of sulphuric acid that must be added in order to protect the tank cars. This had not been a practical question theretofore, for the reason that, as just stated, the movement of nitric acid without the addition of sulphuric acid had not been so large but that glass carboys in sufficient quantity were to be had and shipments of nitric acid and sulphuric acid in tank cars had never contained less than 45 per cent of sulphuric acid, which mixture every one knew was safe to put in steel containers, there being no commercial use for a mixture containing less than 45 per cent of sulphuric acid. During 1918 the bureau was conducting experiments in order to ascertain the lowest percentage of sulphuric acid that must be added in order to make it possible to transport nitric acid safely in tank cars, but these experiments had not been completed. But it was the general consensus of opinion that it was necessary to add about 25 per cent of sulphuric acid by weight in order to protect the iron or steel container and, in the opinion of Dr. Beistle, 20 per cent, the amount added by the importer in the case at bar, was as small a percentage as could have been added with safety to the cars and was even under the limit of safety.

The testimony fairly tends to show that as a commercial proposition there is only one practical means of transporting strong nitric acid such as that involved in the present importation in quantities sufficient to meet the current demand, and that is to mix it with a sufficient amount of sulphuric acid and ship it in tank cars or drums.

The testimony further shows that it would have been impossible even as a commercial proposition to procure, during the time that this shipping was going on, a sufficient number of glass carboys to cut even a considerable figure in the importations which were essential to the conduct of the importer's business.

Further, it appears from the testimony that the importer employed in this importation only sufficient sulphuric acid to render the

shipment of the nitric acid in tank cars safe, namely, about 20 per cent, and that after being imported the mixture was not of proportions making it suitable for use in the importer's business or, so far as appears, for any use as an acid mixture. And the question presented in this case is whether this importation which might technically be called a mixture, was such a mixture as is contemplated by the statute.

It will be noted that the word "mixtures" is used in connection with compounds and preparations. Under the rule of ejusdem generis it would seem that the "mixtures" as here employed must be of the same kind or character of articles as are mentioned in the preceding portion of the paragraph. Of course all chemical and medicinal compounds and all alkalies and alkaloids have a distinct use. The word "preparations" implies of course that they are something prepared and adapted to particular uses or services. It is no stretch to say that the word "mixtures" as here employed was used in a similar sense to import mixtures susceptible of commercial use as they exist, or are at least such as are purposely started on their way toward adaptation to such use. While not resting this case solely upon this view, it certainly would appeal with great force were it the only consideration involved.

But over and beyond this, the question arises as to whether this mixture which in a sense was involuntary, it being a compliance with the regulation which made it possible to import the article into this country, was an act of preparation or an act of admixture with a purpose of producing a new article. Obviously it was not such. It was made necessary by the character of the article to be imported, and by the very appropriate and proper rules and regulations of the Interstate Commerce Commission controlling this shipment. This was not in any true sense an importation of a mixed acid at all. It is evident that the importer sought to introduce nitric acid and had no desire to import sulphuric acid, or nitric and sulphuric acid as a usable mixture. This small percentage of sulphuric acid which was relatively insignificant in its money value was employed solely for the purpose of making it possible to ship the nitric acid into this country in usable quantities. The result was not a mixture merchantable as such for use in the United States. The article imported had to be subjected to one of two processes: It had either to have the sulphuric acid removed or it had to have an additional amount of sulphuric acid added before it could be usable. But as introduced it had no use until subjected to one or the other of these treatments.

Recognizing fully the rule which usually obtains that the condition of an article when imported determines its dutiable status, we think this rule is not infringed by holding this merchandise free goods. The merchandise had not reached the state of a commercial mixture contemplated by the statute. It was susceptible of no use

other than as nitric acid, which must before use be again treated. The mixing of this minimum amount of sulphuric acid should be treated as a means of and part of the shipment, and as an act as essential in the importation of nitric acid as would have been the proper packing of glassware or other goods designed for shipment by rail. It was an act analogous to the packing of goods for shipment. Indeed, in one sense it was the packing of goods for shipment, for the testimony shows that the operation of the sulphuric acid was to absorb the water in the nitric acid, leaving it less liable to corrode the tank than it would if left without this addition. It separated the true nitric acid from the water that it contained, and for which the sulphuric acid had a greater affinity, thus making the shipment in safety possible.

We are therefore of the opinion that the introduction of this minimum but essential quantity of sulphuric acid for the purpose indicated is more analogous to the act of packing for shipment than an attempt to prepare a mixture designed for use.

The board has dealt with this question on two separate occasions. The first case is that of T. D. 36000, G. A. 7828. In that case the evidence showed that a small quantity (3 per cent in value) of sulphuric acid was used for the purpose of protecting the tank car from the effect of nitric acid, as was done in this case, and the evidence also showed that the proportion of sulphuric acid in the mixture had no relation to any particular use; that is, that it would require the addition of much more sulphuric acid to make the mixture usable for trade purposes. The evidence in that case corresponded to that in this. It was said:

We do not believe that in any proper sense this importation can be called a chemical mixture within the purpose and intent of Congress in enacting these provisions. It is without the spirit of the term "chemical mixture" as used in paragraph 5, and for, all practical purposes remains nitric acid.

It was further said:

It is worth noting that sulphuric acid is also free under paragraph 387, and it is unnecessary to decide in this case whether or not sulphuric acid and nitric acid, mixed in substantial proportions for some chemical or trade purpose other than mere protection in transportation, would be free.

In the present case, the majority of the board say of the Benzol Products case:

We did say that nitric acid containing about 3 per cent in value of sulphuric acid, added solely for the purpose of safe transportation, was not within the term "chemical mixture," as used in paragraph 5. If that decision is to be taken as a precedent to warrant holding that where 20 per cent of sulphuric acid by weight is added to the nitric acid for the purpose of safe transportation the mixture is free, then it was wrong and should be overruled.

Clearly that case was authority for the doctrine and could rest upon no other that a sufficient quantity of sulphuric acid to comply

with the regulations of the Interstate Commerce Commission and essential to the safe transportation of the nitric acid did not result in a chemical mixture such as was contemplated by paragraph 5. So that in effect the decision was overruled by the majority of the board in this case.

In other cases the board has laid down a rule that a mixture of nitric acid and sulphuric acid substantially half and half (47 per cent of sulphuric acid and 48 per cent of nitric acid) was dutiable. (T. D. 37285, G. A. 8082.) That case distinguished the Benzol Products case by pointing out that the mixture under consideration in the latter case was a mixture of substantial proportions and because of the further fact "that it is used in the form of a mixture and in the proportions as imported for manufacturing purposes, which was not true in the Benzol Products case."

So that it will be seen that the board, prior to the decision of this case, had drawn the line between mixtures made solely for the purpose of importation and mixtures which were usable in quantities in which they appeared.

Our attention has been called to the decision in United States v. Stone & Downer Co. (175 Fed., 33). The facts in that case were that 15 kilograms of alcohol, valued at 37.50 marks, were placed in kegs containing certain belladonna leaves and stalks cut up and 12 kilograms of alcohol valued at 30 marks were placed in kegs containing aconite leaves and stalks cut up. The merchandise consisted of green belladonna or aconite leaves imported for the purpose of maceration in alcohol and for the purpose of making tinctures and extracts. The alcohol in which the leaves were immersed was continued in use in the maceration in this country, while incidentally it served as a preservation in the importation of said leaves by which the amount of alcohol so used lessened the quantity of alcohol required for complete maceration.

It appeared that the use of this alcohol in this form resulted in poisoning it and prevented any profitable attempt to extract the poison from it or to reduce it to its normal condition. The circuit judge was of the opinion that notwithstanding this fact the alcohol constituted a mere vehicle for the importation of the belladonna and aconite, of no more importance than the cask in which it was packed. The Court of Appeals held otherwise, and in the course of its opinion said, after describing the process:

All this constitutes a process of either a chemical union or an atomic association, continuing from the beginning at the place of exportation until the tincture is complete, ready for the market.

Its final summing up was:

Independently of the infusion into the alcohol of the virtues of the belladonna and the aconite partly accomplished on arrival at the port of importation, even without

which the commingling of the two elements might well be called a "union or mixture" according to lexicographers, yet in every sense the result of the *infusion* constitutes clearly a compound in, as we have explained from the lexicographers, the broad definition of the word. Therefore we have the following decisive elements: First, the broad definition of the word "compound," which, as applied here, is not limited by any trade usage or technical adaptation; second, we have in the mere commingling of two elements of the spirits on the one hand and the leaves and stalks of belladonna and aconite finely cut on the other hand, independently of infusion, a "compound" if it were necessary to leave the case there; third, we have an infusion which is of such a character that it does not result in a chemical change, and leaves the alcohol still alcohol, *although in a deteriorated condition;* (italics ours; it should be noted that there was no claim that this importation was dutiable under the provision for spirits); fourth, whatever may be said about the mere assembling of the different elements, this infusion, under the circumstances established, marks the existence of a compound; *and, fifth, as this infusion commences to be operative from the time the elements are assembled in the country of exportation, and this continues during the voyage, with assistance after arrival of further added alcohol, until, for at least certain purposes, a "tincture," in the strict sense of the word results, it seems to us clear that we have an importation of a compound of such a character and such a continuous history that it relates back to its beginnings at the time of shipment.* (Italics ours.)

In order that we may not be misunderstood, we will state again that we comprehend thoroughly the facts that the whole product is not completed in the form of a tincture, and that the first use of the alcohol is mainly for the purpose of holding in a sound condition the leaves and stalks of the belladonna and aconite. Nevertheless, we can not perceive anything in the statute which justifies us in holding here that the primary purpose of using the alcohol as a mere preservative determines the classification, *although in some cases it would.* On the other hand, the fact is that the importation is an infusion to a greater or less degree, and therefore it is covered by the peremptory terms of paragraph 2, *although under some other paragraphs the purpose of the importation, and not the mere fact of the nature of the article imported, might more or less determine the classification.* (Italics ours.)

It is difficult to conceive any case in which the purpose of the importation and not the mere fact of the nature of the article imported could be more properly invoked for the purpose of determining the classification than in the present case. We could readily assent to the conclusion reached by the Court of Appeals in the Stone & Downer case, for there the commingling of the articles started in force a process by which—dutiable goods being employed—their character had been changed so that on importation they could not well have been rated as distilled spirits and brought under the provision of the statute imposing a duty thereon, but had been committed to a continuing process which dated back to the first commingling of the alcohol with the belladonna and aconite.

In the present case we are convinced that there was neither an advantage to the importer in adding the requisite amount of sulphuric acid to admit of safe shipment of the nitric acid nor was there any possible loss of revenue to the Government. The sole purpose for which this addition was made was to admit of shipment. It would be sticking in the bark to say that this was such a mixture as the statute in question contemplates. It is not yet prepared. It

has not been advanced as a preparation for actual use except to the extent that a small portion of the requisite amount of sulphuric acid which when added in the proper quantity would result in making a mixture which was usable, is found in this tank instead of some other. The quantity is relatively insignificant.

A chemical mixture can hardly be held to cover a material compound of a chemical substance with which there has been commingled by accident, and with no intent or purpose of forming a compound for use, a quantity of other material which may in itself constitute a chemical. This might constitute a mixture in the literal sense, as in this case two chemical substances are mixed, but it seems clear that such a mixture is not what is referred to in the statute. What was meant was, as we think, a mixture which is adapted to use as such. True, this mixture is referred to in the record as mixed acid. Any degree of mixtures would justify this nomenclature, but it is nevertheless neither a usable mixture nor one which the importer purposely, as a process of manufacture, started to make such: It is simply the result of an effort to introduce into this country a quantity of nitric acid. In order to do this the importer was required to add this small quantity of sulphuric acid. The substance of the transaction was the shipment of nitric acid. In adding this, or by the process of commingling the two, no revenue was lost to the Government, for both were free. It is hardly to be conceived that the Government intended to exclude the introduction of nitric acid in quantities adequate to meet any requirements which the business of the country might require. If not, then it must have been contemplated that the necessary precautions in shipping this nitric acid across the border would be resorted to, and it is hardly conceivable that it was the intention to impose a tax on goods otherwise free which are chemically mixed only for the purpose of observing the requirements of the Government as to shipment.

We think that the true rule is that the introduction of a quantity of sulphuric acid solely for the purpose of rendering the transportation of nitric acid safe, and which does not result in a usable mixture, is more in the nature of an act of shipment than an admixture and does not produce a substance which is dutiable under paragraph 5.

The fact that this is called in a sense an acid mixture as would be any acid, no matter what the extent of the substance introduced might be, is not controlling. The only safe line to be drawn is that indicated above.

This is a clear case for the application of the rule that a thing may be within the letter of a statute and yet not within the statute because not within its spirit nor within the intention of its makers. See Church of Holy Trinity v. United States (143 U. S. 457, 459); Heide v. United States (2 Ct. Cust. Appls. 399, 403; T. D. 32166).

The fact that this may work some possible inconvenience is not a serious one, for in every case regulations of the Interstate Commerce Commission, it may be assumed, are within the knowledge of the revenue officers, and the proper tests may be made to ascertain the character and nature of the importation as in all cases.

It may be said that the case is not wholly free from doubt. It is well settled that in such case the construction of the statute most favorable to the importer is to be adopted. See Wright & Graham cases (6 Ct. Cust. Appls., 528; T. D. 36147) and cases cited.

The decision of the board is *reversed.*