UNITED STATES *v.* OLIVIER STRAW GOODS CORP. (No. 3382)[1]

---

[1] T. D. 44898.

United States Court of Customs and Patent Appeals, April 29, 1931

*Charles D. Lawrence*, Assistant Attorney General (*Peter A. Abeles* and *Ralph Folks*, special attorneys, of counsel), for the United States.

*Walden & Webster* (*Walter F. Welch* and *Edward F. Jordan* of counsel) for appellee.

[Oral argument February 6, 1931, by Mr. Jordan and Mr. Folks]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:

The merchandise involved in this suit consists of braids, for use principally on ladies' hats, the braids being made from a material which led the collector of customs to classify them for duty at 90 per centum ad valorem under paragraph 1430 of the Tariff Act of 1922; the importer protested, claiming them to be dutiable at only 60 per centum ad valorem, under paragraph 31 of said act; the Customs Court sustained the protest, and the Government has appealed from its judgment.

In view of the fact that paragraph 1430 refers to certain articles included in paragraph 1213, it is, for a proper understanding of the case, necessary that the pertinent portion of the last-named paragraph be quoted, along with parts of 1430 and 31.

PAR. 1430. * * * braids, * * * by whatever name known, and to whatever use applied, and whether or not named, described or provided for elsewhere in this Act, when composed wholly or in chief value of yarns, threads, filaments, * * *, or products of cellulose provided for in paragraph 1213 of this Act, 90 per centum ad valorem * * *.

PAR. 1213. * * * products of cellulose, not compounded, whether known as visca, cellophane, or by any other name, such as are ordinarily used in braiding or weaving and in imitation of silk, straw, or similar substances * * *.

PAR. 31. Compounds of * * * cellulose, by whatever name known * * *; made into finished or partly finished articles * * * 60 per centum ad valorem: *Provided*, That all such articles (except photographic and moving-picture films), whether or not more specifically provided for elsewhere, shall be dutiable under this paragraph.

The primary issue in this case is, Are the articles products of cellulose, not compounded, as contended by the Government, or are they made from compounds of cellulose, as contended by the importer?

If the former, the judgment of the Customs Court must be reversed; if the latter, affirmed.

In its decision the Customs Court said:

On the trial of the case two samples of the merchandise in question were admitted in evidence. Also a vial containing certain water, and a vial containing certain sulphur, obtained in the process of analyzing exhibits of the merchandise involved, have been admitted in evidence. The evidence shows that in making a test to determine whether or not the merchandise in question is a compound it was first placed in an oven and heated at a temperature of from 103° to 105° C. for a period of 17 hours. It was then taken out and weighed and replaced in the oven at the same temperature for an additional hour. When it was reweighed there was found to be no loss in weight. This heating or baking process was for the purpose of removing from the merchandise any and all hygroscopic moisture.

The merchandise was then analyzed and the water, constituting Exhibit 7, was taken therefrom. The evidence shows that in 100 pounds of the material or merchandise in question the proportion of water and cellulose is at the ratio of 4 pounds of water to every 96 pounds of cellulose, and that the water was actually and necessarily introduced into the mixture to make the filaments; that it is a valuable and desired ingredient, improving the economic value of the filament, permitting the dyeing thereof to the desired tinctorial strength with the use of less dye than would otherwise be required.

The merchandise, upon being further analyzed, showed that it contained a certain amount of sulphur, as indicated by Exhibit 2. One witness testified that this sulphur was in chemical combination with the cellulose; that a negligible amount of free sulphur was also present in the material, but that this was disregarded as an impurity. The weight of the evidence bears out the contention that the amount of sulphur found in the material and the amount of sulphur taken out in the manufacturing process is controllable, and that the manufacturer does make use of this control to produce certain characteristics which he desires to be imparted to the finished article. By similarly convincing evidence it is shown that both the water and sulphur were intentionally mixed with the cellulose to make the finished article, and that they were not placed therein accidentally or incidentally.

The learned chemists who testified in this case are not entirely in accord as to the nature of the bond which united the cellulose, the water, and the sulphur— whether it was chemical, chemicophysical, or physical—but as to the fact that the substances are united they are all agreed. Doctor Little, a chemist with 40 years' experience, testified: "No chemist knows why salt dissolves in water, but that it does all are agreed."

From these findings of fact the court concluded that—

* * * the mass of material which constitutes the filaments * * * answers every requirement of a compound adopted and followed by the courts, as hereinafter set out.

This we regard as a finding of law rather than of fact.

The court expressly declined to decide whether the merchandise is a chemical compound, holding it unnecessary to do so, "under the authorities cited, * * * especially in view of the fact that paragraph 31 provides for compounds of cellulose, and not for chemical compounds of cellulose."

In the main we agree with the court below in its findings of fact. While the Government is rather insistent upon the proposition that more weight should have been given to the testimony of certain of its witnesses than, apparently, was given, we are unwilling to say that the court's findings of fact are not sustained by the weight of the evidence.

We think, however, that certain additional facts shown by the record should be stated.

The Customs Court findings give the percentage of nonhygroscopic moisture remaining in the material but do not give the percentage of sulphur.

The testimony of Doctor Worden, who, we think, made the most complete and satisfactory analysis of the merchandise, establishes the fact that the amount of sulphur left in the product as an integral part thereof ranges from 0.018 of 1 per centum to 0.026 of 1 per centum.

This is quite a small amount, and there is testimony by other witnesses indicating quite strongly that this amount is left therein simply because it does not harm the product, and it is not necessary or profitable to pursue the process of removal to the extent of taking all trace of it out, although, as stated by the court below, this probably would be possible.

In *United States* v. *Thomas & Pierson*, 18 C. C. P. A. (Customs) 142, T. D. 44360, this court held, to quote from the syllabus—

Certain bath salts in cubes, composed of sodium carbonate and sodium perborate, prepared with the addition of perfumery, without alcohol, and used to perfume and soften the water and give tonic action to the skin, is more specifically provided for as a *toilet preparation* under paragraph 62, Tariff Act of 1922, than as a *compound or mixture of chemical salts* under paragraph 5 of said act.

The writer of the present opinion dissented from the conclusion reached by the majority in the above last-cited case, but, of course, it is recognized as being the controlling law. In that case the prevailing opinion intimated, but did not decide, that the goods at issue might be a compound. Whether this intimation was on account of the trace of perfumery therein, or on account of other features, was not stated.

It is believed, however, that even had the material there involved been expressly held to be a compound, solely by reason of the trace of perfume there present, the instant case is clearly distinguishable from it, under the facts here appearing as to the reason for the sulphur and water being put into the product involved.

The evidence, we think, shows quite clearly that the purpose of using carbon bisulphide from which the sulphur in the finished product comes, is primarily and solely to perform a certain chemical function upon the elements of the raw material so as to produce viscose or visca, and it is not inserted for the purpose of producing either

a chemical compound or a compound in the common understanding of that term. The same thing is true of the water used.

We are strengthened in this opinion by the testimony of all the witnesses, including that of importer's expert, Doctor Worden, that, after the viscose has been produced, it is, before being made into braids, further processed by removing as much of the sulphur as is, apparently, commercially practicable.

It is in evidence that such sulphur as remains in the finished product gives it a certain luster, but much of the testimony tends to show that this is not a feature which is especially sought for. Indeed the fact that the braids, in many instances if not in all, are dyed and have their natural colors changed, would seem to negative the idea of luster being consequential. There is no claim that the presence of the sulphur has any relation to the dyeing process or any effect upon it. Only the nonhygroscopic water is claimed to be useful for the dyeing operation.

From page 254 of Schorger on "Chemistry of Cellulose and Wood," published in 1926, the Government's brief quotes the following:

VISCOSE—In 1893, Cross and Bevan published their discovery of the viscose reaction. They found that when cellulose was impregnated with a mercerizing solution of caustic soda, and carbon bisulphide then added, a water-soluble sodium salt of cellulose xanthogenic acid or thiocarbonic acid was obtained. This salt, called viscose, could be readily decomposed with the formation of a gelatinized cellulose. The regenerated cellulose was known as viscoid, though to-day the term is generally supplanted by viscose.

At page 260 this same author states:

* * * The viscose solution is forced by high pressure through fine orifices into a coagulating bath. Sulphuric acid and sodium acid sulphate are usually used as coagulants on account of their cheapness, in which case gelatinized cellulose is obtained at once. A modification consists in forming a thread of coagulated sodium cellulose-xanthogenate by means of salts, followed by a second bath to convert it to cellulose.

In *Monticelli Bros. et al.* v. *United States*, 8 Ct. Cust. Appls. 21, 24, T. D. 37162, this court said:

* * * a compound or combination is a thing which results from the act of compounding or combining, and that obviously is the putting together or mixing in some manner of the materials requisite therefor.

We think it certain from the record in this case that there was no deliberate purpose of producing a compound. Whatever sulphur remained was left, not to perform a function in the finished article but, largely, because it was commercially impractical to remove it, and we do not regard the small quantity of nonhygroscopic water as affecting the product in a tariff sense. We, therefore, are unable to agree with the trial court that the mixture shown created such a

compound as Congress contemplated by the language of paragraph 31 of the Tariff Act of 1922.

It would seem as though the construction given the statute by the learned judge who wrote the opinion of the Customs Court might have the effect of rendering nugatory much of paragraph 1213, because it is extremely improbable that all traces of sulphur and water will, in many instances, be entirely removed from products such as those here involved.

In *Birn & Wachenheim* v: *Du Pont Cellophane Co.*, 17 C. C. P. A. (Customs) 122, 126, T. D. 43454, cellophane sheets were involved. This court, speaking through Judge Bland, held the merchandise to be a "compound of cellulose in sheets," because, as a final step in their production, they were found to be—

subjected * * * to a glycerin bath which combines the cellulose hydrate with the quantity of glycerin required to give the sheet the quality of flexibility that fits it for commercial use.

At a later place in the opinion, it is said:

In the case at bar the glycerin becomes an integral component part of the imported merchandise. The mixture of cellulose and glycerin was intentional and not incidental. See *Aetna Explosives Co.* v. *United States*, 9 Ct. Cust. Appls. 298, T. D. 38238.

We have very carefully examined the authorities cited in the exceedingly well-prepared brief of counsel for appellee, but we find none which leads us to feel that the view here taken is incorrect.

Notwithstanding, or perhaps it might better be said, because of the evidence presented in this case, additional to that presented in the here-incorporated record of *Olivier Straw Goods Corp.* v. *United States*, decided by us and reported in 15 Ct. Cust. Appls. 22, T. D. 42134, we are convinced that the merchandise involved is, as it was there, in effect, held to be a "product of cellulose, not compounded," such as Congress provided for in paragraph 1430 by reference to paragraph 1213.

The classification by the collector was correct, and, therefore, the judgment of the Customs Court must be and is *reversed*.