(C. D. 851)

COLLIN & GISSEL *v.* UNITED STATES

United States Customs Court, First Division

(Decided May 3, 1944)

*Philip Stein* for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Frank X. O'Donnell, Jr., John J. McDermott, Dorothy C. Bennett*, and *Richard F. Weeks*, special attorneys), for the defendant.

Before OLIVER, WALKER, and COLE, Judges

COLE, Judge: Before discussing the issue raised through the collector's classification and plaintiff's claim, it is necessary to consider defendant's motion to dismiss protest 30206–K on the ground of untimeliness. The motion was presented to the trial judge who denied it when it was made at the hearing in Houston, Tex., where the merchandise was entered. The question is a jurisdictional one, and therefore is a proper subject for discussion at any time during pendency of the case (*United States* v. *Mexican Petroleum Corp.*, 28 C. C. P. A. 90, C. A. D. 130). The basis for the motion is explained in the uncontradicted testimony of the deputy collector of customs at Houston.

Summarized, the facts are: The merchandise was entered as being free of duty under a classification for ferrous sulphate or copperas in

paragraph 1675 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1201, par. 1675). The entry, No. 0929–H, was liquidated on September 12, 1939, the collector assessing duty at the rate of 25 per centum ad valorem under paragraph 5 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 5), within a classification for mixtures of chemical compounds, not specially provided for. The bulletin posting, as of that date, inadvertently showed "no change" in liquidation from the classification sought on entry. The error stayed until the deputy collector received instructions from the Comptroller to collect the increased duties, whereupon, in a letter under date of February 5, 1940, the liquidator was notified of the mistake. Instead of preparing a new bulletin notice, the word "increase" was inserted after the entry number in question on the original posting, and the date "February 7, 1940," was added by the deputy collector, indicating the time when the correction was made.

Defendant claims that the action of the deputy collector on February 7, 1940, completed a valid liquidation, and therefore the statutory time within which a protest could be filed began as of that date. Based on that premise, it is contended that the protest, filed on April 11, 1940, or 64 days after the alleged legal liquidation, is too late, section 514 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1540), and consequently should be dismissed.

The statutory provisions, section 505 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1505), relating to the liquidation of entries, are as follows:

\*    \*    \*    \*    \*    \*    \*

Upon receipt of the appraiser's report and of the various reports of landing, weight, gauge, or measurement the collector shall ascertain, fix, and liquidate the rate and amount of duties to be paid on such merchandise as provided by law and *shall give notice of such liquidation in the form and manner prescribed by the Secretary of the Treasury*, and collect any increased or additional duties due or refund any excess of duties deposited as determined on such liquidation. [Italics ours.]

Pursuant to the above statutory authority, the Secretary of the Treasury in article 818 of the Customs Regulations of 1937, in effect at the time of the present importation, issued regulations for collectors of customs to follow in giving notice of liquidations. Paragraph (i) thereof provides in part that—

\*    \*    \*    \*    \*    \*    \*

The bulletin notice of liquidation shall be posted as soon as possible in a conspicuous place in the customhouse for the information of importers and shall be dated with the date of posting. The entries for which the bulletin notice of liquidation has been posted shall be stamped "liquidated" and *with the date of liquidation which shall be the same as the date of the bulletin notice of liquidation.* Such stamping is the legal evidence of liquidation.

The above regulations have the force and effect of law. *United States* v. *Astra Bentwood Furniture Co.*, 28 C. C. P. A. 205, C. A. D. 147.

In determining whether there has been a final legal liquidation of the entry in question, our consideration must be directed to the collector's action of February 7, 1940. The earlier bulletin notice of September 12, 1939, was unquestionably defective. Recognition by the collector for the necessity of a correction amply supports this conclusion. Hence, the sole question concerning the action of February 7, 1940, is whether the method followed by the collector was sufficient to validate the liquidation.

Equally important with the bulletin notice is the requirement that the entry so posted shall be stamped "Liquidated" with the date of liquidation, *"which shall be the same as the date of the bulletin notice of liquidation."* That was not done and failure to do so is fatal to a complete liquidation. Under the requirements of article 818 (i), *supra*, proper notice includes stamping the entry as well as conspicuous listing on a bulletin, each to bear the same date. Without one, the other has no effect. Both are mandatory as part of regulations having the force and effect of law.

The situation thus presented is an incomplete liquidation, being one that lacks the force of finality. A complete liquidation, which is a final legal liquidation, contemplates not only that the collector shall "ascertain, fix, and liquidate the rate and amount of duties to be paid," but he shall also "give notice of such liquidation in the form and manner prescribed by the Secretary of the Treasury," and it is only against such a liquidation that valid protest can lodge. *Astra Bentwood Furniture Co.* case, *supra*. Following the rule invoked therein, we find that the entry in question was not finally legally liquidated, and accordingly hold protest 30206–K to have been prematurely filed. The ruling of the trial judge is reversed, and protest 30206–K is dismissed.

The said protest embodies a claim that the liquidation of September 12, 1939, was invalid because of improper posting of the entry, and in line therewith counsel for plaintiff in his brief argues that payment of the increased duties on April 11, 1940, when the protest was filed, conveyed legal authority to file suit against the exaction based on an illegal liquidation. Such contention is wholly without merit, under *Gallagher & Ascher* v. *United States*, 21 C. C. P. A. 313, T. D. 46832, which held in effect that the statute, section 514 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1514), fixes a time limit of 60 days within which the legality of a liquidation must be protested. The action, dismissing protest 30206–K as prematurely filed, supports an alternative position taken by plaintiff in the discussion set forth in counsel's brief.

Thus our discussion of the issue becomes limited to protest 37731–K, which is confined to the merchandise invoiced as "221 bags of * * * sulphate of iron extra dry 'snow'," classified by the collector as a mixture of chemical compounds under paragraph 5 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1001, par. 5), the assessment being 25 per centum ad valorem. Plaintiff claims the merchandise to be entitled to free entry under paragraph 1675 of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1201, par. 1675), providing for "ferrous sulphate or copperas."

The character of the merchandise is undisputed, the parties agreeing that the chemist's report (plaintiff's exhibit 2) correctly describes the commodity as "greenish-white, granular powder," having the following chemical analysis:

| | |
|---|---|
| Acid Insoluble | 0. 2% |
| Copperas (FeSO$_4$ 7H$_2$) | 95. 8% |
| Calcium Sulphate | 4. 3% |

The correctness is also conceded of the statement in said report that "the calcium sulphate is not an impurity, but has been added in the form of lime as a drying agent for the copperas."

The testimony of two chemists was introduced, one appearing on behalf of the plaintiff and the other for defendant.

Plaintiff's witness, a chemist with 25 years' experience, stated that he is connected with the company that "supplied the materials to the company that made this particular importation," and that his experience has included handling copperas. His testimony concerning the character and use of the imported commodity is sufficient for the following factual basis: Calcium sulphate was included in the imported merchandise to prevent the ferrous sulphate or copperas from caking, and the quantity thereof, 4.3 per centum, in the present shipment merely reduced the percentage of ferrous sulphate but did not affect its chemical or mechanical properties or the use of the merchandise "for water treatment, as a disinfectant treatment, in horticultural work." There are purer qualities of copperas than the importation in question, but "technical copperas normally tests about 95% plus," and is sold at such percentage. The imported commodity would be recognized as a technical grade of ferrous sulphate or copperas.

Defendant's witness was a chemist with 7 years' experience in the employ of the United States Government, five of which were spent in the customs service at New Orleans. He analyzed the shipment covered by protest 30206–K, previously dismissed, which involved merchandise substantially the same as that under consideration. He recognized "copperas" as a "trade name" which "could be called different things in different parts of the country," and as something that "may mean anything depending upon where

it is used," although in reply to the question, "You know that copperas is commercial ferrous sulphate," he said, "Yes, sir." In the light of the witness' experience and his statements concerning the term "copperas," his testimony is viewed entirely from a chemical standpoint. Thus analyzed, it supports the following: Ferrous sulphate is substantially 100 per centum pure, allowance for impurities being limited to "the fourth and fifth decimal points." It is used as a reducing agent in chemical testing. It is customary to add a drying agent, like calcium sulphate, to ferrous sulphate when it is powdered. Although the instant merchandise is copperas, which has some use "for water treatment," the addition of calcium sulphate with the ferrous sulphate caused the latter to lose its identity as such and to become one of a mixture of chemical compounds.

So far as we have been able to determine, the paragraph invoked by plaintiff has not been the subject of any customs litigation. No case has been called to our attention, nor have we been able to locate any in our research, which involved the provision under which classification is sought. The following review of the legislative history of the paragraph in question is enlightening toward a proper conclusion of this case. In the Tariff Act of 1897, the provision for "copperas" appeared in paragraph 19 thereof, reading, "copperas or sulphate of iron, one-fourth of one cent per pound." The same language was reenacted in the Tariff Act of 1909, paragraph 19, but the rate was reduced to fifteen-hundredths of one cent per pound. In the Tariff Act of 1913, paragraph 462, "copperas, or sulphate of iron" was included in the free list. The change in language first appeared in paragraph 1573 of the Tariff Act of 1922 (19 U. S. C. 1934 ed. § 1201, par. 1573), reading "ferrous sulphate or copperas." The "Summary of Tariff Information, 1921," in discussing "ferrous sulphate (copperas)," at page 1305, contains the following explanation:

*Important changes in classification.* "Sulphate of iron" has been changed to "ferrous sulphate," as this is the chemical designation of copperas, which is the only important sulphate of iron.

In the same official document and in connection with the same subject matter (page 1305), under the heading "Description and uses," appears the following:

*Description and uses.* Ferrous sulphate or copperas is a by-product obtained by evaporation from the "pickling solutions" used for cleaning iron plates and wires before galvanizing, tinning, or enameling. Copperas is used principally as a mordant in dyeing, for the purification of water, and in the manufacture of black inks and pigments containing iron; also for the production of rouge, for the purification of coal gas, for the precipitation of gold in metallurgical processes, and for refining glycerine.

Paragraph 1675 of the present tariff act (19 U. S. C. 1940 ed. § 1201, par. 1675), upon which plaintiff relies, is the prototype of paragraph

1573 of the Tariff Act of 1922, *supra*. The discussion of the latter in the "Summary of Tariff Information, 1929," contains the following:

*Description and uses.* Ferrous sulphate, known as copperas, or green or iron vitriol, occurs in commerce as large, pale-green crystals, readily soluble in water. A low-grade ferrous sulphate, containing impurities which impart a dark color is known as black vitriol. Ferrous sulphate is used for the purification of water, in the manufacture of black inks and pigments, as a mordant in dyeing, and in smaller quantities for the production of polishing rouge and prussian blue.

The above quotations give clear indication that "ferrous sulphate" and "copperas," as used in paragraph 1675, *supra*, are synonymous terms. The references also corroborate the testimony to the effect that ferrous sulphate is recognized commercially as copperas.

Leading lexicographic authorities lend further support to this conclusion. The New International Encyclopaedia says that "copperas" is "The name given to the commercial ferrous sulphate * * *." In the Encyclopaedia Britannica, "copperas" is described as "green vitriol, or ferrous sulphate, Fe $SO_4H_2O$, having a bluish-green colour and an astringent, inky and somewhat sweetish taste." Funk & Wagnalls New Standard Dictionary defines "copperas (Chem.)" as "A green crystalline astringent, ferrous sulphate ($FeSO_4$) used in dyeing, ink-making, photography, etc."

Being satisfied that the copperas contemplated by paragraph 1675, *supra*, is a commercial ferrous sulphate, the question now presented is whether or not the copperas under consideration, containing, as it does, a small amount of calcium sulphate, is classifiable under the specific provision in said paragraph. In making this determination, the reasoning applied in *United States* v. *Aetna Explosives Co.*, 256 U. S. 402, has effective use here. In that case, the importation consisted of nitric acid, to which has been added sulphuric acid to the extent of approximately 20 per centum by weight and 5 per centum according to value. The court found that the sulphuric acid had been added solely for transportation purposes, to permit shipment in large quantities of nitric acid in steel cars without corroding them. *Aetna Explosives Co.* v. *United States*, 9 Ct. Cust. Appls. 298, T. D. 38238, excluded the importation from classification as a mixture of chemicals and held it to be nitric acid, free of duty as such under paragraph 387 of the Tariff Act of 1913. In affirming this conclusion, the Supreme Court said:

We find no reason for disapproving the conclusion reached by the Court of Customs Appeals. The applicable tariff act granted free entry to both nitric and sulphuric acids, and, viewed practically, the commodity in question was nothing more than nitric acid rendered non-injurious to steel tanks by adding sulphuric acid of small value. The two acids do not interact and the result was a mere mechanical mixture not intended or adapted as such for commercial use and not a chemical mixture within the true intent of paragraph 5.

The controlling principle there is applicable here. The addition of the calcium sulphate did not change the chemical properties of the ferrous sulphate or copperas. The reason for its content is set forth in the following testimony of plaintiff:

Q. Are you acquainted with the reason for adding a small percentage of calcium sulphate to copperas?—A. I am.

Q. And what is that reason?—A. When copperas is shipped in bags there is a tendency for it to cake, especially when shipped by boat. In barrels we do not have that condition. It is customary with many chemicals to add some inert substance as a drying agent.

Like the mixture of acids involved in the cited case, the substances included in the instant importation "do not interact," the compounding resulting only in a mechanical mixture. It is a fair conclusion, in the light of the present record, that calcium sulphate served no other purpose than as a preservative for the ferrous sulphate during the period of its transportation.

Plaintiff's witness—whose testimony presented the only commercial aspect on the proposition before us, defendant testifying purely from a chemical standpoint—stated that the commodity in question is a technical grade of ferrous sulphate or copperas, and that it is recognized and sold as such. Under the principle that tariff laws are drafted in the language of commerce, which is presumptively that in common use (*Meyer & Lange et al.* v. *United States*, 6 Ct. Cust. Appls. 181, T. D. 35436) plaintiff's testimony is accepted as controlling.

The language of paragraph 1675, *supra*, being unlimited, and without qualifying or restricted terms, includes all forms of the merchandise specifically provided for (*Nootka Packing Co. et al.* v. *United States*, 22 C. C. P. A. 464, T. D. 47464), and since the instant importation is in fact copperas, although a certain brand or quality of commercial ferrous sulphate, it is properly classifiable under said paragraph and entitled to free entry thereunder, as claimed. For the reasons hereinabove set forth, protest 37731–K is sustained to the extent indicated.

Judgment will be rendered accordingly.