(C.D. 2260)

ULTRA RAY PEARL ESSENCE CORP., c/o U.S. PLASTICS ET AL.
*v.* UNITED STATES

United States Customs Court, First Division

(Decided May 29, 1961)

*Sharretts, Paley & Carter* (*Eugene F. Blauvelt* of counsel) for the plaintiffs.
*William H. Orrick, Jr.*, Assistant Attorney General (*Mollie Strum* and *Murray Sklaroff*, trial attorneys), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise in the case at bar consists of certain "pearl essence," which was assessed with duty at the rate of 3½ cents per pound and 25 per centum ad valorem under paragraph 27(a) (4) and (5) of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, supplemented by T.D. 52820, under the provision therein for "All mixtures, including solutions, consisting in whole or in part of any of the products provided for in subdivision (1), (2), or (3) of paragraph 27(a), Tariff Act of 1930 (except sheep dip and medicinal soaps, and except products chiefly used as assistants in preparing or finishing textiles)." Plaintiffs claim the involved merchandise dutiable at the rate of 11 per centum ad valorem under paragraph 66 of the tariff act, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, as "Pearl essence."

Paragraph 27 of the Tariff Act of 1930, coal-tar products, provides:

(a)(1) * * * phthalic acid, * * *

\* \qquad \* \qquad \* \qquad \* \qquad \* \qquad \* \qquad \*

(3) all products, by whatever name known, which are similar to any of the products provided for in this paragraph or in paragraph 1651, and which are obtained, derived, or manufactured in whole or in part from any of the products provided for in this paragraph or in paragraph 1651.

The defendant concedes that but for the language of paragraph 28(i) of the Tariff Act of 1930, the involved merchandise would be properly classifiable under paragraph 66, *supra*. Said paragraph 28(i) of the tariff act provides:

Any article or product which is within the terms of paragraph 1, 5, 37, 39, 60, 66, 82, or 1687, as well as within the terms of paragraph 27, 28, or 1651, shall be assessed for duty or exempted from duty as the case may be under paragraph 27, 28, or 1651.

Counsel for the respective parties stipulated that the imported material "consists of a lead compound and other materials" and is composed of the following:

| | |
|---|---|
| Lead compound | 63% |
| Methyl Isobutyl Ketone | 30% |
| Di Octyl Phthalate | 3% |
| Cellulose Nitrate | 4% |

It was further stipulated that di octyl phthalate is derived from phthalic acid (named in paragraph 27) and is similar thereto, but that none of the other constituents of the imported material are derived from, or are similar to, any of the products provided for in paragraph 27 or in paragraph 1651.

Plaintiffs called two witnesses. No witnesses testified on behalf of the defendant. Gilbert C. Richman, an adequately qualified witness, who is president of United States Plastic Products Corp. and secretary of Ultra Ray Pearl Essence Corp., stated that his company uses the imported material in the manufacture of its principal products, primarily the manufacturing of rigid plastic sheets with end uses of mother-of-pearl buttons, ladies' pocketbooks, jewelry, and similar novelty items (R. 7). A sample section of one of the plastic sheets so manufactured was received in evidence as plaintiffs' illustrative exhibit 1 (R. 9), as was a sample of certain plastic "button blanks," made or stamped from the manufactured sheets (plaintiffs' illustrative exhibit 2 (R. 10)).

Mr. Richman testified that the material at bar was always imported in polyethylene jars of 1 kilogram each; that, prior to the importation in question, he had imported material of a slightly different composition, but that such material proved unsatisfactory because of evaporation of the solvent through the pores of the polyethylene jars, which caused a deposit of lead carbonate crystals on the inside wall of the polyethylene containers, rendering the sheeting unsatisfactory for sale. The witness stated that, subsequently, a change of solvent was made from methyl-ethyl ketone to methyl-isobutyl ketone, which had a lower volatility, and a small amount of di octyl phthalate was added to

retard the evaporation of the vehicles, after which, it appears, the product was found satisfactory (R. 12–13).

Mr. Richman further testified that the imported material was added to a colorless liquid plastic mix in the proportion of 2 grams per pound of mix, which he calculated to be less than one-half per centum by weight, the actual di octyl phthalate content figured to be 132 parts per million, or 0.015 per centum. He stated that he had made plastic sheets like plaintiffs' illustrative exhibit 1 with the use of so-called pearl essence, a natural material derived from fish scales, with substantially the same effect as that obtained from the imported material which, he testified, serves no other purpose than to impart the desired color or pearly appearance to the plastic sheets manufactured by his company (R. 17–18). Mr. Richman further stated that he made plastic sheets of a different type from plaintiffs' illustrative exhibit 1, in which case, di octyl phthalate in the range of 5 to 8 per centum is added "to render flexibility to the sheeting so that when it is formed under heat, it will form more readily and not go back to its original flat position," and in which process the imported material is also added in the same proportions as when making sheeting, such as that at bar, but that the 3 per centum of di octyl phthalate content in the mixture is so insignificant that it is not used in the calculation for the additional di octyl phthalate (R. 18–20).

On cross-examination, Mr. Richman testified that the di octyl phthalate is used as a plasticizer for vinyl, cellulosic, and acrylate resins and synthetic rubber. The witness stated that if the mixture such as that imported did not contain di octyl phthalate nothing would happen, testifying that his company had made plastic sheeting without any di octyl phthalate, and "we achieved the same result"; that, in place of di octyl phthalate, di octyl sebacate was used "as a plasticizer" (R. 21–24); that, currently, and after the importation before the court, his company imported this pearl pigment with di octyl sebacate as the inhibitor to retard evaporation; and that, in manufacturing plactic sheets from material containing di octyl sebacate, the same recipe was employed and that the sheet so manufactured is the same as the sheet manufactured from di octyl phthalate (R. 28). Plaintiffs allege, in this connection, that di octyl sebacate is not a coal-tar derivative and that it is not provided for in paragraph 27, 28, or 1651.

The second witness called by the plaintiffs was Dr. William E. Decker, consulting chemist and consultant to manufacturers of structural coal-tar pigments and pearl essence pigments, who substantially confirmed the testimony of plaintiffs' previous witness. The witness testified that imitation pearl essence pigments were used to produce pearly effects in a product, by incorporating them with different dyes and pigments to produce novel colors, such as in coating fancy decorative box paper. He thereafter described the manner in which the

imported material is used to bring about the pearly effect, such as that found in plaintiffs' illustrative exhibit 1. Dr. Decker further testified that the methyl isobutyl ketone in a product such as that imported served merely as a vehicle to keep the crystals apart and that the crystals would be useless if they were imported dry; that, in the manufacture of sheets, such as plaintiffs' illustrative exhibit 1, the methyl isobutyl ketone or solvent is lost by evaporation and passes off in the form of vapor or gas; that, with respect to the di octyl phthalate, "conceivably a small amount of it vaporizes, though that would be a very fractional amount on account of its high boiling point. The rest of it just sweats out" (R. 37–38); that the cellulose nitrate content remains in the polymerized sheet as a molecular film layer around the individual crystals of lead carbonate; that the only function of the di octyl phthalate is as a retardant to prevent the evaporation of the low boiling solvent during transportation of the product in the polyethylene containers which, the witness stated, are very porous (R. 38–39). Dr. Decker further stated that the small percentage of di octyl phthalate, as found in the imported material, would not have an effect as a plasticizer for flexibility purposes (R. 40–41), agreeing, however, that di octyl phthalate was known as a plasticizer, as is di octyl sebacate, and that the primary use of di octyl phthalate is as a plasticizer (R. 43–44).

The issue in this case is whether or not the product at bar is embraced within the provisions of paragraph 27(a) (4) and (5) of the Tariff Act of 1930, as amended, for "All mixtures, including solutions, consisting in whole or in part of any of the products provided for in subdivision (1), (2), or (3) of paragraph 27(a), Tariff Act of 1930." If the merchandise at bar is so included, the protests herein must be overruled, even though the material in question is a "pigment," since, concededly, paragraph 28(i) of the tariff act, *supra*, provides that where merchandise is provided for in both paragraph 27 and paragraph 66 of the tariff act, the former paragraph governs.

Plaintiffs maintain that the importation at bar is not a mixture within the meaning of paragraph 27(a) (4) and (5), as amended, *supra*, because, as contended, the di octyl phthalate is present only for the purpose of transporting the merchandise in a safe and merchantable condition and that the di octyl phthalate is of no significance in determining the character or nature of the imported material which, it is alleged, is a "pigment," imported for pigment use. The defendant, on the other hand, maintaining that the merchandise at bar is a "mixture," alleges that the di octyl phthalate, acting as a retarder, is an integral, component part of the mixture, without which such mixture could not perform its designated function as a "pigment" and would have no commercial value, and that the importation is,

accordingly, dutiable, as classified, and this irrespective of whether or not the di octyl phthalate is a packing material.

In support of their claim, the plaintiffs herein cite the holdings in *Aetna Explosives Co.* v. *United States*, 9 Ct. Cust. Appls. 298, T.D. 38238, affirmed in *United States* v. *Aetna Explosives Co.*, 256 U.S. 402; *Collin & Gissel* v. *United States*, 12 Cust. Ct. 188, C.D. 851; and *American Bitumuls & Asphalt Co.* v. *United States*, 45 Cust. Ct. 1, C.D. 2188.

In the *Aetna Explosives* case, *supra*, the involved merchandise consisted of a mixture of nitric acid and sulphuric acid, imported in railroad tank cars. It appears that an addition of 20 per centum of sulphuric acid to the nitric acid was necessary to prevent the nitric acid from corroding the tanks, it being established that only enough sulphuric acid was added to comply with certain regulations of the Interstate Commerce Commission in force at the time of importation. It was further shown that it was commercially impracticable at that time to ship nitric acid in any other way; that the mixture had no commercial use; that no commercial advantage was gained by the importation of either acid in this manner; that there was no chemical union of the two acids; and that, before being used by the importer in manufacturing explosives, it was necessary to add more sulphuric acid to the product in question. In holding that the involved importation was not a chemical mixture, but was properly free of duty as nitric acid, our appellate court, in the *Aetna* case, *supra*, pages 302–303 stated:

\* \* \* It is evident that the importer sought to introduce nitric acid and had no desire to import sulphuric acid, or nitric and sulphuric acid as a usable mixture. \* \* \*

\* \* \* The mixing of this minimum amount of sulphuric acid should be treated as a means of and part of the shipment, and as an act as essential in the importation of nitric acid as would have been the proper packing of glassware or other goods designed for shipment by rail. \* \* \*

In the *Collin & Gissel* case, *supra*, an importation of ferrous sulphate, to which had been added 4.3 per centum of calcium sulphate, solely for the purpose of preventing the ferrous sulphate from caking, was held properly free of duty as ferrous sulphate under paragraph 1675 of the Tariff Act of 1930, rather than dutiable under paragraph 5 of the act as a mixture of chemical compounds, as classified. In its decision, the court, applying the reasoning expressed in the *Aetna* case, *supra*, page 194, stated:

\* \* \* The addition of the calcium sulphate did not change the chemical properties of the ferrous sulphate or copperas. \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Like the mixture of acids involved in the cited case, the substances included in the instant importation "do not interact," the compounding resulting only in a

mechanical mixture. It is a fair conclusion, * * * that calcium sulphate served no other purpose than as a preservative for the ferrous sulphate during the period of its transportation.

In the *American Bitumuls* case, *supra*, the merchandise under consideration was so-called cutback asphalt, which consisted of solid asphalt mixed with 20 per centum of a kerosene-like distillate of petroleum, so that the resultant product, in its condition as imported, was in a liquid state. The importation was admitted to free entry under paragraph 1710 of the Tariff Act of 1930 for "Limestone-rock asphalt; asphaltum and bitumen," but a tax of ¼ cent per gallon was assessed on the product under a provision of the Internal Revenue Code imposing such tax on "all liquid derivatives of crude petroleum." The record disclosed that, in the production of the involved product, a certain crude oil, of high asphalt content, was subjected to distilling operations by which the lighter fraction, such as naphtha and kerosene, were removed. The residue remaining was asphalt, which, at normal temperatures, is a solid. In order to transport such asphalt, it was necessary to heat it until it was in a liquid state, or to mix it with a suitable solvent, forming the so-called cutback asphalt, in which process the mixing was mechanical and did not effect any chemical reaction. The court, in the *American Bitumuls* case, *supra*, in holding that the imported product was not a liquid derivative of crude petroleum and accordingly not taxable as such, page 4, stated:

> * * * Cutback asphalt is not itself a direct derivative of crude petroleum. It is a physical mixture of two derivatives of petroleum, one a solid and the other a liquid. One of those derivatives, i.e., asphalt, gives the merchandise its name cutback *asphalt*, and its character.
>
> *       *       *       *       *       *       *
>
> There is no question but that the attributes, qualities, or properties of the imported merchandise which distinguish cutback asphalt from other things and show its essential or intrinsic nature are those which it possesses because of its asphalt content. These are the attributes, qualities, or properties which are sought for in use, while the other derivative of crude petroleum used in the making of cutback asphalt, the solvent, is merely the medium or vehicle used for transporting and applying the asphalt, and disappears in use. The *character* of the imported product is that of asphalt; its more or less temporary *state* is that of a liquid. [Italics quoted.]

The factual situations in the cases above cited, in support of the claimed classification for the involved merchandise, are different, however, from that which obtains in the case at bar, and, accordingly, those cases are distinguishable from the case before us. It appears that in each of the above-cited cases, the question at issue was whether or not a particular entity or commodity had been so changed in nature or character by admixture that it had lost its identity as such entity and had become merely an indeterminate mixture of materials no longer identifiable as the claimed commodity, thus nullifying classification of the imported product under its claimed specification. As

heretofore noted, in the *Aetna* case, *supra*, the court held that the involved importation had not lost its character as nitric acid; in the *Collin & Gissel* case, *supra*, that the addition of the calcium sulphate to the ferrous sulphate did not render the latter anything but ferrous sulphate. In the *American Bitumuls* case, *supra*, the court held that the mechanical mixing of solid asphalt with a kerosene-like solvent to facilitate transportation of the product did not render the importation a "liquid derivative of crude petroleum," but that the character of the merchandise there imported was still that of asphalt, having the attributes, qualities, or properties of such. In the cases cited by plaintiffs, the provision for "mixtures," such as here involved, was not under consideration. The question here, unlike the situation which obtained in each of the above-cited cases, is not whether or not the merchandise, as imported, has the attributes or properties of a particular character, with or without the addition of the coal-tar derivative, di octyl phthalate, but is whether or not the involved product, as imported, is a "mixture," "consisting in whole or in part of any of the products provided for in subdivision (1), (2), or (3) of paragraph 27 (a), Tariff Act of 1930."

The defendant, on its part, in support of the classification here made, directs our attention to the holding of the court in the case of *Bjelland, Lange & Co., Inc.* v. *United States*, 41 C.C.P.A. (Customs) 168, C.A.D. 545. The merchandise there involved was sardines packed in herring oil. The question for determination was whether or not the involved importation, in addition to the imposition of duty under the tariff act, was subject to an additional tax imposed under the provisions of sections 2490 and 2491 of the Internal Revenue Code on certain oils, including fish oil, and a tax on "any article, merchandise, or combination * * * 10 per centum or more of the quantity by weight of which consists of" one or more of the oils so designated in the aforesaid provisions of the code. The importer contended that the oil in question was, in fact, mere packing material and that, in order to be exempt from the internal revenue tax, it was sufficient to show that the herring oil was of no commercial value, maintaining in this connection that the tax was imposed on the oil *per se*. Our appellate court, in the *Bjelland, Lange* case, *supra*, held that the action of the collector in imposing the internal revenue tax was not upon the herring oil, as such, but was upon sardines in herring oil, which latter condition the court found was present in the cited case, and that, accordingly, the question whether the oil, as such, was mere packing material or whether it was valuable or worthless was immaterial.

While the *Bjelland, Lange* case, *supra*, did not involve the coal-tar provisions of the tariff act, the situation in that case is somewhat parallel to that in the present case in that, in the cited case, the provisions of the Internal Revenue Code imposed a tax not only upon her-

ring oil imported, as such, but also upon herring oil content in another article or combination of articles. Similarly, paragraph 27 of the Tariff Act of 1930 provides for the assessment of duty not only on di octyl phthalate itself, a coal-tar derivative, but also for classification at the relevant rate on "mixtures, including solutions, consisting in whole or in part of any of the products provided for in subdivision (1), (2), or (3) of paragraph 27(a), Tariff Act of 1930 * * *." The record herein discloses that the product at bar, in its imported condition, is a "mixture"—"an intimate grouping of two or more separate compounds that do not react with one another chemically" (R. 41)— and further shows that it consists in part of di octyl phthalate, a derivative of coal tar. Accordingly, in our opinion, the importation is specifically provided for under the provisions of the tariff act under which it was classified. It further appears that, to be useful as a pigment, the lead carbonate crystals must be in some sort of carrier (R. 37) and that the coal-tar portion in the product is necessary to prevent the evaporation of the solvent (R. 25). The situation in the latter regard may be likened to that which obtained in the case of *Plant Products Corporation* v. *United States*, 44 C.C.P.A. (Customs) 183, C.A.D. 658, where, in holding an insecticidal compound known as Parathion to be a coal-tar product, our appellate court, page 185, stated:

> In the instant case, as above noted, the record shows that at least one-third of Parathion is derived from coal-tar and that the portion so derived is essential to its proper functioning as an insecticide. Under such circumstances we conclude that Parathion is a coal-tar product within the meaning of paragraph 27 of the Tariff Act of 1930.

On the basis of the record here presented and the related authorities, we hold the merchandise at bar properly dutiable under paragraph 27(a) (4) and (5) of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, supplemented by T.D. 52820, under the provision therein for "All mixtures, including solutions, consisting in whole or in part of any of the products provided for in subdivision (1), (2), or (3) of paragraph 27(a), Tariff Act of 1930 * * *," as classified.

The protests herein are overruled. Judgment will issue accordingly.